NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0322n.06

Case No. 25-2186

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

NICHOLAS CORY PLUG,

    Plaintiff-Appellant,

v.

VAN BUREN COUNTY, MICHIGAN; DANIEL ABBOTT, in his individual and official capacities; DILLON KELLY, in his individual and official capacities; ROSLYNN HICKMOTT, in her individual and official capacities,

    Defendants-Appellees,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jul 21, 2026
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

OPINION

---

Before: MOORE, NALBANDIAN, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** Nicholas Plug was arrested on state methamphetamine charges and detained at the Van Buren County Jail in Michigan. At booking, Plug stated that he was a methamphetamine user and that he was experiencing COVID-19 symptoms. Over the next eleven days, the jail's nurse monitored his vitals and symptoms. But on the morning of the twelfth day, sheriff's deputies realized Plug was having a serious medical crisis that required emergency care. The deputies transported Plug to a hospital where a physician determined that Plug had suffered a stroke, leaving him with permanent brain damage.

Plug sued Roslynn Hickmott, a nurse at the jail, and sheriff's deputy Dillon Kelly under 42 U.S.C. § 1983, alleging that they acted with deliberate indifference toward his medical needs in violation of the Fourteenth Amendment. He also sued Van Buren County and Sheriff Daniel

Abbott for failure to train and supervise and for maintaining an unconstitutional policy of denying adequate medical care to detainees with drug withdrawal symptoms. The district court granted summary judgment to the defendants. We affirm.

**I.**

On October 5, 2020, the Van Buren County Sheriff's Department arrested Plug on state charges of manufacturing methamphetamine. When Plug arrived at the county jail, Deputy Dillon Kelly was the booking officer on duty. For every new detainee, the booking officer completes a batch book form. The form indicates, among other things, any medical conditions that the officer observes. On Plug's batch book form, Kelly marked "Yes" in response to whether Plug "Appears To Be Under The Influence Of Alcohol Or Drugs Or Has Visible Signs of Withdrawal." R. 65-1, PageID 446. But otherwise, the deputy observed no signs of illness or injury.

Next, Kelly conducted a medical questionnaire. Plug answered "No" to every medical question, including whether he had high blood pressure.[1] Kelly then administered a drug-and-alcohol questionnaire. Relevant here, Plug disclosed that he smoked and snorted methamphetamine regularly, but that he had not done so since the day before. Plug also stated, however, that he does not experience withdrawal symptoms when he stops using methamphetamine. Finally, Plug completed a COVID-19 questionnaire, indicating that he was experiencing multiple COVID-19 symptoms, including fever, shortness of breath, diarrhea, and uncontrollable coughing.

To prevent the spread of COVID-19, deputies placed Plug in a holding cell separate from the general population. Kelly testified that he checked on Plug every 15 to 30 minutes when he was on duty.

---

[1] Plug later testified that he told Kelly he had high blood pressure and was taking medication for it.

Plug also received three visits from Nurse Roslynn Hickmott, who worked at the jail.

*October 9.* Hickmott first saw Plug on October 9 to check on his reported symptoms and to administer a COVID-19 test. In her progress notes, Hickmott wrote that Plug had a dry cough and shortness of breath. She also noted that Plug's skin was warm and dry (as opposed to cold and clammy), his body did not ache, and he was "eating well." R. 65-3, PageID 469.

*October 14.* Hickmott visited Plug and told him that his COVID-19 test results were negative. Hickmott observed some changes in Plug's speech, which she documented in her progress notes: "[Plug] mumbled some words. Some words clear. . . . Seems alert—but won't talk when spoken to[]." *Id.* at 470. Hickmott later testified that she did not view Plug's behavior as a sign of neurological distress, nor did his speech indicate to her a change in his physical or mental condition. Instead, Hickmott "believed that [Plug] was just upset for being in jail and just not wanting to talk to us." R. 65-4, PageID 490.

In any event, Hickmott conducted a battery of tests. Plug's blood pressure was 142/100, which worried her a bit; typically, she liked to see measurements no higher than 160/90, and Plug's was "right on the edge." *Id.* at 491. But apart from that, Hickmott saw little cause for concern. According to her progress notes, Plug reported no pain whatsoever. His respiration was easy and his cough was gone. He also had no problem moving his arms and legs. And Plug still ate all his meals. While his mumbling was unusual enough for Hickmott to make a note about it, she also wrote that Plug "[s]eem[ed] alert" and "[f]ollow[ed] commands when asked." R. 65-3, PageID 470.

*October 15.* The next day, Hickmott visited Plug for the last time. While Hickmott could not recall the exact reason for her visit, she believed it was "to follow up from probably his blood pressure." R. 65-4, PageID 491. Her progress notes do not indicate any major medical changes

since the day before. Plug continued to mumble, but again, his words were generally "clear" and "correct[]." *Id.* He was "[a]lert" and "respond[ed] to verbal commands." *Id.* He also moved all his extremities well. And while his blood pressure remained high, it had dropped slightly to 140/98.

Still, Hickmott documented two behavioral changes. One, Plug was eating less; rather than eating all three meals, he did not finish his lunch and ate only a little dinner. Two, Plug was "[s]leeping most of the day." *Id.* Yet these behaviors did not worry Hickmott, who testified that "sleeping most of the day is not a big deal" for detainees—especially a detainee like Plug who had recently stopped using methamphetamine, a potent stimulant. *Id.* at 490. And Plug was not out cold; he "w[o]ke[] up" and "respond[ed] when spoken to[]." R. 65-3, PageID 470.

But in the early hours of October 16, Deputy Dillon Kelly realized that Plug was having a serious medical crisis. When Kelly was on his rounds, Plug told the deputy he felt ill. Kelly testified that he "pulled [Plug] out of his cell, sat him outside the guard station, talked to him for a minute, tried to figure out what was going on, [and] realized there was a medical issue." R. 65-5, PageID 517. First, Kelly attempted to contact his supervisor but failed to reach him. So Kelly called the staff doctor, who asked if Plug needed to go to the hospital. The deputy replied, "I'd feel more comfortable with [Plug] going to the hospital. *Id.*

That same day, officials transported Plug to the hospital. There, medical staff diagnosed Plug with acute ischemic left MCA stroke and aphasia, as well as methamphetamine abuse and possible pneumonia. Relevant here, aphasia is a neurological disorder that affects how an individual uses and understands language.[2] For example, after arriving at the hospital, Plug says

---

[2] *See Aphasia*, Cleveland Clinic (last updated May 23, 2026), https://perma.cc/4YCC-QU66.

he "couldn't even talk to [his] mom, [and he] couldn't speak [his] name." R. 69-3, PageID 630. The stroke left Plug with permanent brain damage.

According to Plug, the stroke had occurred by October 14, when Hickmott first documented his speech issues and elevated blood pressure. Plug also believes that, by the time he was transported to the hospital, he was already outside the window for certain critical treatments and interventions—which, if administered within 48 hours of the onset of his stroke, could have prevented his brain damage.

Plug sued under 42 U.S.C. § 1983. He alleged that Hickmott and Kelly were deliberately indifferent to his medical needs in violation of the Constitution. Plug also sued Van Buren County and Sheriff Abbott under § 1983 for failure to train and supervise and for maintaining a policy of denying adequate medical care to detainees with drug withdrawal symptoms. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The defendants moved for summary judgment on all claims. A magistrate judge recommended that the district court grant summary judgment to Kelly, Abbott, and the County but deny summary judgment to Hickmott. The district court adopted in part and rejected in part the magistrate judge's recommendation and granted summary judgment to all defendants. Plug now appeals.

**II.**

We review the district court's grant of summary judgment de novo. *Boyd v. N. Biomedical Rsch., Inc.*, 165 F.4th 424, 431 (6th Cir. 2026). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**III.**

"The Civil Rights Act of 1871 . . . guarantees a federal forum for claims of unconstitutional treatment at the hands of state officials." *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019) (citation modified); *see* 42 U.S.C. § 1983. To succeed on a § 1983 claim, a plaintiff must show: (1) "a right secured by the United States Constitution," and (2) "the deprivation of that right by a person acting under color of state law." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020) (quotation omitted).

The qualified-immunity doctrine shields government officials from § 1983 liability under certain circumstances. "A public official is entitled to qualified immunity at summary judgment when, viewing the facts in the light most favorable to the plaintiff, the challenged conduct did not violate clearly established constitutional rights of which a reasonable person would have known." *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (citation modified).

Plug contends that Hickmott and Kelly were not entitled to qualified immunity on his deliberate-indifference claims and that Van Buren County and Abbott were not entitled to summary judgment on his *Monell* claims. We address each argument below.

**A.**

Start with Plug's deliberate-indifference claims against Hickmott and Kelly. The Fourteenth Amendment's Due Process Clause guarantees pretrial detainees the "right to be free from deliberate indifference to their serious medical needs." *Howell v. NaphCare, Inc.*, 67 F.4th 302, 310 (6th Cir. 2023). To succeed on a deliberate-indifference-to-medical-needs claim, Plug must make two showings: "(1) that he had an objectively serious medical need and (2) that each defendant acted deliberately and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 311 (citation modified).

A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Greene v. Crawford County*, 22 F.4th 593, 607 (6th Cir. 2022) (quotation omitted).

To satisfy the second prong, Plug must show that Hickmott and Kelly "recklessly acted or recklessly failed to act where a reasonable official in their position would have recognized" the high risk of harm posed by Plug's serious medical need. *Howell*, 67 F.4th at 312. He must prove "more than negligence but less than subjective intent—something akin to reckless disregard." *Brawner v. Scott County*, 14 F.4th 585, 596–97 (6th Cir. 2021) (quotation omitted). In deciding whether the defendants ignored a serious medical need, "we cannot impute knowledge from one defendant to another," and so "we must evaluate each defendant individually." *Greene*, 22 F.4th at 607 (citation modified). And we have recognized that "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he reasonably deferred to the medical professionals' opinions." *Id.* at 608 (citation modified).

We assume without deciding that Plug could show an objectively serious medical need. Still, Hickmott and Kelly are entitled to qualified immunity because Plug cannot show that they violated his constitutional rights.

*Nurse Hickmott.* Plug cannot show that Hickmott recklessly acted or recklessly failed to act in response to his medical needs.

Plug arrived at the county jail on October 5, 2020. He reported that he used methamphetamine regularly and that he had COVID-19 symptoms, including a dry cough and shortness of breath. On October 9, the first day Nurse Hickmott treated him, these symptoms persisted. But Plug was eating well and did not complain of any other ailments.

By Hickmott's next visit on October 14, Plug's COVID-like symptoms had subsided. In fact, he denied feeling any pain at all. Although Plug mumbled his words and appeared generally reluctant to speak, he did not present any aphasia or other stroke-like symptoms that should have been obvious to Hickmott. On the contrary, he understood Hickmott, answered her questions, and followed her commands when prompted. And when Hickmott could hear Plug's words, his communication was "clear" and "[a]lert." Nor did Plug present any mobility issues associated with strokes; he moved all his limbs freely. True, his blood pressure was elevated. But Plug does not challenge Hickmott's assertion that a blood pressure reading of 142/100, absent other symptoms, required daily monitoring—which Hickmott did—but not emergency medical intervention.

A day later, Plug continued to have complete control over his motor functions. His communication struggles remained issues of volume and enunciation, as opposed to the more obvious signs of aphasia he later presented at the hospital. At 140/98, his blood pressure remained high enough to require continued daily monitoring but had improved slightly. True, Plug was sleeping more and eating less. But according to Hickmott, diminished energy and appetite are common among detainees—an assertion that Plug does not dispute.

To recap: Plug manifested no pain or mobility issues; he was alert and able to follow commands; he was sleeping a lot, but Nurse Hickmott never struggled to wake him; he continued to eat, though his appetite had begun to taper off; his blood pressure was elevated but stable; and although he mumbled many of his words, other words were clear. Considering this evidence presented, no reasonable jury could find that Plug's symptoms were such obvious indicators of a stroke that it was reckless of Hickmott to conclude otherwise.

Plug disagrees. He argues that a jury question exists about whether Hickmott acted recklessly. For support, he relies on a report from his expert, Dr. Lucia Zamorano, which opines that Plug's symptoms on October 14, combined with heightened stroke risk due to Plug's methamphetamine use, should have signaled to Hickmott that Plug had suffered a stroke. But even if a jury believed Dr. Zamorano, the report does not claim that Hickmott or anyone else recklessly disregarded Plug's medical needs. At most, her report states that Plug's symptoms "should have made the diagnosis of [a] possible stroke," and that Hickmott's misdiagnosis constitutes "medical negligence." R. 58-1, PageID 320, 324. But Plug must prove "more than negligence" to support a deliberate-indifference claim. *See Brawner*, 14 F.4th at 596–597.

Also, the cases that Plug relies on are distinguishable. In *Mercer v. Athens County*, we held that a reasonable jury could find deliberate indifference where a nurse denied a pretrial detainee emergency treatment, despite the nurse's knowledge that the detainee suffered seizures, fell and hit her head, lost consciousness, and urinated on herself. 72 F.4th 152, 161–62 (6th Cir. 2023). But the *Mercer* detainee's need for emergency treatment was much more obvious than Plug's need for stroke intervention. And Hickmott acted in response to the symptoms that she did identify. *Grote v. Kenton County* does not help Plug either. 85 F.4th 397 (6th Cir. 2023). There, we determined that a triable issue of fact existed as to whether a nurse showed deliberate indifference in denying emergency treatment to a detainee who, after revealing that he had taken a lethal dose of methamphetamine, was shaking uncontrollably and hyperventilating. *Id.* at 408–11. But aside from the involvement of methamphetamine, *Grote* is not analogous. Plug did not suffer a methamphetamine overdose; he suffered a stroke—the risks of which were, at most, heightened by past methamphetamine use. Finally, in *Howell v. NaphCare, Inc.*, we held that a jury could reasonably find deliberate indifference where a nurse dismissed a detainee's cries of

pain as a "psychiatric episode," despite her knowledge that the detainee had sickle cell disease. 67 F.4th at 312–14. By contrast, Plug never reported or otherwise manifested any pain to Hickmott that would indicate an obviously serious medical need.

Because no reasonable jury could find that Hickmott knew or should have known about a serious medical need based on her interactions with Plug, his deliberate-indifference claim against Hickmott fails.

*Deputy Kelly.* Plug's deliberate-indifference claim against Kelly fares no better. Kelly and Plug had a few interactions. The first occurred on October 5, 2020, when Plug arrived at the jail. Kelly was the booking officer on duty. He documented Plug's past methamphetamine use (along with his observation that Plug appeared to still be under the influence of methamphetamine) and Plug's COVID-19 symptoms. Kelly logged this information digitally, with the expectation that it would be "uploaded straight to [the jail's] medical team so that it can be seen and gone over by them." R. 65-5, PageID 503. This was reasonable under the circumstances—after all, Plug offers no evidence that, as early as October 5, he was already presenting stroke symptoms so obvious that Kelly should have taken more drastic measures. Thus, by collecting Plug's medical information at booking and promptly transmitting it to the jail's medical staff for review, Kelly "reasonably deferred to the medical staff's judgment" concerning the treatment Plug should receive. *Howell*, 67 F.4th at 317.

Over the next eleven days, Kelly continued to monitor Plug while doing his rounds. Prior to October 16, there is no evidence—and Plug does not claim otherwise—that Kelly observed any symptoms that Hickmott did not also observe. As we have discussed, Plug's need for stroke-intervention treatment would not have been obvious to Hickmott, a trained medical professional.

Accordingly, we can conclude that Plug's medical need during this period would not have been obvious to Kelly, who lacked Hickmott's training and expertise.

The last relevant interaction between Plug and Kelly came on October 16, when Plug told the deputy, for the first time, that he did not feel well. After talking with Plug and realizing "there was a medical issue," Kelly called the staff doctor and recommended that Plug be taken to the hospital. R. 65-5, PageID 517. In short, Kelly did more than simply defer to a medical professional; he affirmatively recommended that Plug receive emergency care. Plug does not tell us what Kelly should have done differently on October 16. And the actions Kelly did take were not reckless. Thus, based on the record before us, Plug's deliberate-indifference claim fails as to Kelly as well.

**B.**

Plug also brings § 1983 *Monell* claims against the County and Sheriff Abbott for failure to train and supervise and for maintaining a policy that denies detainees with drug withdrawal symptoms access to adequate and timely medical care. But "there can be no liability under *Monell* without an underlying constitutional violation." *Chambers v. Sanders*, 63 F.4th 1092, 1101–02 (6th Cir. 2023) (citation modified); *see also Grote*, 85 F.4th at 414. Because Plug has not established a constitutional violation, his *Monell* claims fail.

**IV.**

For these reasons, we **AFFIRM** the district court's judgment.